at all. Mr. Moffitt. Thank you, Your Honor. Your Honor, I'm David Moffitt. I'm here on behalf of the defendants and appellants, and I'd like to reserve two minutes for rebuttal. I've got the request to regret it. Thank you, Your Honor. Your Honor, I know you're familiar with the papers and the facts of the case. Unless you would like me to review any of the facts, I'd like to turn to the legal arguments. There are essentially two bases for our appeal. The first is that the district court erred in granting summary judgment in favor of the plaintiff in this breach of contract case, finding that the guarantee at issue had no ambiguity on the face of the document, and further declining to look to extrinsic facts to determine whether or not a latent ambiguity existed. Our quarrel with the decision of the district court is that on its face, the guarantee in this case has a patent ambiguity. Now, the ambiguity arises from three what I would call time limitations or non-limitations on the obligations to be guaranteed. The first in boilerplate language in a forum guarantee says that all obligations now existing or hereafter... Counsel, this is Judge Albasert. Yes, Your Honor. I just would like... You said you had two points. Would you mind giving the two points and then discuss them in detail? I'm sorry. What was your second point? I'm sorry, Your Honor. I skipped that part of the summary. The second point is that defendant's position is that a material modification of the underlying guaranteed obligation occurred between the creditor, which was the Amerisource Bergen Drug Corporation, and the obligee, which was the pharmacy company for which Mr. Meyer, the guarantor, was an absentee owner and officer. The obligee means the obligor. Obligor. Sorry, Your Honor. You're correct. I stand corrected. Thank you. Thank you. Returning to the issue on patent ambiguity, there are three time concepts with respect to which obligations were to be guaranteed by the guarantee in this case. The first one is in the boilerplate form of the agreement, which was prepared by Amerisource Bergen and says that the guarantee covers all obligations now existing or hereafter arising. Clearly language of a continuing guarantee without temporal limitation with respect to which obligations are covered. Now, counsel, again, just so that I can follow this, the critical sentence is that you say it is ambiguous on its face. This is not a continuing guarantee and expires nine months from the date of signing. Is that it? Your Honor, the ambiguity arises between the contrast of that sentence and the sentence I just quoted from the boilerplate portion of the guarantee, which says that all obligations here and after arising without time limitations are covered by the guarantee. The limiting sentence, which you refer to, is the source of the patent ambiguity. It's in direct contrast to the prior sentence. Additionally, well, the sentence Your Honor points to was a sentence that was specifically added by Amerisource Bergen after Mr. Meyer, the guarantor, refused to sign the unlimited guarantee. It seems to me that the logical reading of this is that the guarantee expires nine months after the time of sign. Your Honor, how is it any more complicated than that? Because that's not all it says, Your Honor. What you said would have renders this is not a continuing guarantee language superfluous. Okay, but there are two components to that sentence. And there is a conjunctive and between two terms. Doesn't what you say render the words here and after arising superfluous? No, what it does is it creates an ambiguity. And I would say that the prevailing term should be the so-called Dickert term, the negotiated term that was underlined and placed in this document as a limitation on the boilerplate in order to induce the signature of the guarantor. Yes, there is a contrast. That doesn't render that language superfluous. I think it conflicts with that language, therefore giving rise to, if you look at the document as a whole, to a patent ambiguity. And if I may, Your Honor, comment on the expiration language. Mr. Meyer was not represented by counsel when he entered into this guarantee agreement. What does the term expiration mean? The plaintiffs would take the position that expiration means that after the so-called date of expiration, no further obligations incurred in the future would be guaranteed. Mr. Meyer's understanding of the term expiration was his potential liability drops off completely regardless of prior defaults. He is not entitled to, or ABDC, Mayor Schwarzberg, would not be entitled to pursue him. So that would mean then that unless they were able to sue him within the nine-month period and get a judgment within the nine-month period, they had nothing. Because even if they sued him, certainly they couldn't sue him after the nine-month period, so they would have to sue almost immediately after the delivery of the goods, over the very few months. But even if they sued within that period, at the end of the nine-month period, there wouldn't be any guarantee left. It would go foof! And then they'd... And it sounds like a bad deal, doesn't it, Judge? And I've been troubled by the same thoughts that you're expressing here. But Mr. Meyer didn't write that language. It was written by Mayor Schwarzberg and Drug Corporation. And if they had intended to say... Did he think he had to be sued within nine months or never? If that's what you're saying. That's a generous reading opposite to you. Under a real reading, he had to be sued even if the suit was brought. There's no good unless you got the judgment. Is that what he thought? That he couldn't be sued after nine months? He did not believe that he could be... that a judgment could be executed against him regardless of when he got sued. Your Honor, it was not Mr. Meyer's language. Mr. Meyer is not a lawyer. He was given language with two components to it, that the guarantee was not a continuing guarantee. He understood that limitation to mean that he could only be pursued for existing obligations, not obligations incurred in the future. Separately, he believed that the entire guarantee, any obligations, dropped off after nine months. And if I just may answer that question. I'm sorry, Your Honor. I just want... I'm having difficulty following your argument. That he did not understand that hereafter arising, that there was ambiguity in that? Well, Your Honor, hereafter arising, if you have the guarantee before you, is a term that unlimited continuing guarantees include in order to... Well, you say that this man was not represented by counsel. That's beside the point, I think. I think what we're talking about is whether the language hereafter arising and then putting a limitation of six months on his obligations certainly assists him. And I just want to know where is the special ambiguity that requires us to consider patent extrinsic evidence? Your Honor, the key... There should not be a... Hereafter arising is a broad expression. But later on, that is limited and assists him. Now, what is his complaint? Your Honor, his complaint is that the terminology in the last sentence, it has two parts of the last sentence. The first phrase is, this guarantee is not a guarantee. Excuse me. This guarantee is not a continuing guarantee. The second half of that sentence says, and expires nine months from the date of signing. What's the trouble there? It's absolutely consistent. Hey, this is not an open-end guarantee. It expires in nine months from the date of signing. Well, the first part of that sentence states, denotes, Your Honor, is that it is not a continuing guarantee, period. It doesn't limit... Except there's no period. Yeah, except the word, the conjunctive and. It doesn't say, but the fact that it's not limited, or the fact that it's not continuing is limited by the nine-month period. It says, and if Mr. Meyer were to be entering a guarantee that expressly was straightforward and clear, it would have said, this guarantee does not apply to obligations arising nine months after execution. That would be clear. This is absolutely unclear. It says, not continuing. Mr. Meyer's reasonably interpreted not continuing to mean that it applies only to existing obligations, not to obligations incurred at any time in the future, whether one day, one month, one year in the future. That is the source of the ambiguity on the face of this guarantee, Your Honor. Mr. Boffert, you have a second point. You haven't gotten to that in 30 seconds. Your Honor, the second point was that there was a material modification of the creditor-debtor relationship that was guaranteed by Mr. Meyer. The prime vendor agreement that was guaranteed by Mr. Meyer provided for different kinds of credit terms. The standard terms were net 15 days. Payment would be due in 15 days. More generous credit terms were limited to so-called opening orders. An opening order is what it denotes by its terminology. It is the first order for each of the facilities of the pharmacy that was guaranteed by Mr. Meyer. What happened, as we explained in our papers, is that opening orders were made in a total amount of $123,000. And they were subject to up to 150 days repayment terms under the terms of the prime vendor agreement. So those extended credit terms. Mr. Boffert, even under your explanation, didn't Mr. Meyer understand that he was on the hook for way more than what he was eventually found liable for under the guarantee? Didn't he guarantee $350,000 of each opening order? He did not. And that was an argument that was made by my opponents and adopted by the district court in error. What the prime vendor agreement does is it limits the extended credit terms, the long repayment terms, to opening orders. In fact, it's not disputed that the opening orders that occurred in this case were limited to $123,000. So regardless of whether or not there could have been opening orders of up to $350,000 per location, totaling $1.4 million, that didn't happen. And the risk that was guaranteed by Mr. Meyer was extended credit repayment terms on $123,000, not on $1.4 million. And the argument that, well, that could have happened is unavailing. Because when Amerisource Bergen allowed the pharmacy extended credit terms for virtually all the debt that was incurred, they changed the terms of the agreement. Without an integrated agreement, there was no written modification, and no one ever went to Mr. Meyer as guarantor and saw his consent. Okay. Thank you, Mr. Laffer. We thank you, and we'll have you back on rebuttal. Mr. Borger. May it please the Court, my name is Matt Borger. I'm with Claire Harrison Harvey Brands Bergen Elders on behalf of Apelli Amerisource Bergen Drug Corporation. Your Honors, we're here today because of a broken promise, a broken, unambiguous promise that Mr. Meyer made to guarantee all obligations of APS to Amerisource from September 2nd, 2003, the date the guarantee was signed, for nine months into the future. Your Honors, Mr. Meyer is a sophisticated businessman. He had signed guarantees before. When he signed the guarantee on September 2nd, 2003, he understood that he was guaranteeing all obligations into the future. We know that because on December 5th, 2003, when APS sold all of its assets to RTIN, the asset purchase agreement makes clear that as of that date, as of December 5th, 2003, on that date, APS owed Amerisource approximately $1 million, and Mr. Meyer had guaranteed that amount. That's an agreement that Mr. Meyer signed. But Your Honors, I'd like to turn first to the alleged contract ambiguity question, and Judge Fischer, I think you hit the point, hit the nail right on the head. This contract is, on its face, clearly not ambiguous. To test that, what I'd like to do is look at Mr. Meyer's proffered reading of the contract. Mr. Meyer would have the court read the phrase, not a continuing guarantee, separate and apart from the nine-month language at the end of the last sentence. What his reading, what Mr. Meyer wants the court to do, is to say the phrase not a continuing guarantee means this guarantee only applies to opening orders. That's not what the contract says, and this court cannot stretch the contract, cannot stretch that language to get where Mr. Meyer wants the court to go. In fact, the reading that Mr. Meyer has proffered is unreasonable and simply can't be accepted because the phrase not a continuing guarantee necessarily implies some sort of temporal limitation. Inherently, there must be a temporal limitation. Again, Mr. Meyer wants the court to separate not a continuing guarantee from the nine-month language. So then ask yourself, if you separate the language, what would the temporal limitation be on this purported non-continuing guarantee? The contract only makes sense if the language is read together, not a continuing guarantee limited by the clearly set forth nine months. Your Honor, to apply the purchase is only within the first five months, and after that, it wouldn't apply. Correct, Your Honor. So your explanation is not at all complex, quite simple. Quite simple, Your Honor. And I guess to put a finer point on it, if Mr. Meyer had intended for the guarantee only to apply to opening orders, the guarantee should have said this guarantee only applies to opening orders. In interpreting the contract and defining the intent of the parties, this court should look just to the language of the contract. Now, it's interesting that Mr. Moffitt makes arguments about what Mr. Meyer intended, what his intent was, but that simply doesn't come into this case because the contract on its face is unambiguous. The court should not review, should not get into what Mr. Meyer allegedly thought, particularly given the fact that on December 5, 2003, he acknowledged that he was on the hook for $4 million. I'd like to also just point out that Mr. Meyer's position is actually internally inconsistent, okay? He changes what his alleged interpretation of the phrase means throughout his papers. So sometimes, for instance, page 19 of his brief, Meyer argues that the guarantee under his reading only applied to presently existing transactions, right? That's the first interpretation that he advances. Well, on September 2, 2003, there had only been one opening order placed. After that interpretation, Mr. Meyer would advance the theory that, well, what the guarantee meant was that this should apply to opening orders that were placed contemporaneously with the signing of the guarantee. There were two opening orders that were placed around the time, September 2 and then September 3. Then in footnote 23, footnote 7 on page 23 of his brief, Meyer argues, well, all right, actually the guarantee applies to all opening orders. And the last two opening orders were placed on September 23 and September 25. Even under Meyer's, even in Meyer's own papers, the proper interpretation just doesn't make sense. This court should look just to the plain language of the contract as the district court, as Judge Seurig did. The contract is clear on its face. Unless there are questions, I'll turn to the second argument. Just one more point on the contract argument, and Judge Greenberg, I would argue that this reading, the reading in this contract, the proper interpretation, is even more stretched than other readings, other contracts that you've interpreted. For instance, the Unisys long-term disability ERISA case. You'll recall in that case, Unisys was arguing that this court should interpret the phrase benefits you, meaning the plan participant received, should actually mean benefits you, the plan participant received, and your dependents. They were trying to stretch the language of benefits you receive, and this court rejected that interpretation. In that case, Unisys was even able to look at or pull in potential information regarding the way Social Security benefits are received. They were at least able to come up with an argument. But even in that case, the court held that the contract was simply unambiguous and parole evidence should not come in. The same is true of the Duquesne light case, Your Honor. In that case, Duquesne was trying to argue that the generators at issue that Westinghouse sold should be held to a 40-year life. Even in that case, they were able to point to some language in one of the exhibits regarding the lifespan of the nuclear power plant, 42 years. They said, well, since it says 42 years in the back of the contract, maybe we can apply 40 years in the front of the contract. Your Honor rejected that. Let me turn to the second argument, the discharge argument. The key here is that Mr. Meyer must prove that without his consent, there was a material modification of the agreement that materially or substantially increased his risk. Is that totally an assumption? That he's a compensated insurer? Meyer has conceded that he is a compensated insurer, Your Honor. Yes, in his papers he concedes that he's a compensated insurer. What makes you kind of curious about that? Because I don't think he actually got a fee for it. What makes you an uncompensated insurer? I think that's a good example, yes, of what an uncompensated insurer you would be. In this case... It's also an example of a fool. Well, that's true, Your Honor. But in this case, remember, Meyer owned 50.5%. He was the majority shareholder of APS. He was the president of APS. Because of that, and he concedes this, he was a compensated insurer. So he's compensated because, in effect, his company's getting a benefit from this signature, even though nobody's going to pay him. That's correct, Your Honor. That's correct. So what the court needs to look to to determine whether Mr. Meyer's risk was increased, you have to start by looking, all right, well, what was Meyer's risk at the outset? And, Judge Fischer, again, I think you pointed this out in Mr. Moffitt's argument. At the outset, the limit of Mr. Meyer's risk was $1.4 million of extended payment term invoicing. And, again, let me separate just the regular invoices from the extended payment terms. Again, Meyer agreed to guarantee all purchases that APS made from the date of the guarantee for nine months. It's Meyer's argument that it's the extended payment term invoicing and the increase in extended payment term invoicing that increased his risk as a surety. To determine whether there was an increase in the risk, start by looking at what his risk was at the outset. And, again, in the prime vendor agreement, his risk at the outset was $1.4 million worth of extended payment invoicing. It's important to note that the $350,000 per location extended payment invoicing number, the $350,000 number, came from Meyer himself. He's the one who said the maximum that we will probably need per location is $350,000. So his total exposure at the outset on extended payment term invoicing is $1.4 million. Now, it's impossible that Mr. Meyer's risk increased because, in fact, he was never on the hook for more than $1.4 million in extended payment term invoicing. It was much less, much less than the $1.4 million. Now, Mr. Moffitt didn't mention in his argument that the second idea, the second concept that Mr. Meyer advances regarding the material modification and substantial increase in his risk has to do with the fact that, again, APS's assets were sold to RTIN. Your Honor, as we point out in our papers, the Garden State tanning case is directly on point here. Mr. Meyer cannot argue that the sale of assets to RTIN somehow increased his risk when he's the one who was the driving force behind the sale. He's the one who was driving the sale forward, who brought RTIN in, and who effectuated the sale. Meyer is the one who signed the papers. Amerisource was not a participant. Amerisource never consented to the sale to RTIN. Amerisource was not a signatory to that agreement. It was Meyer who drove that sale, and Meyer cannot rely on that fact in arguing that there was a material modification. Mr. Borger, let me ask you a question about the application of payments. Mr. Moffitt didn't raise it in his argument, but it's clearly in his briefs. Why shouldn't the payments that were made by RTIN, after they purchased it, why shouldn't more of them have been applied to the yearling debt as opposed to the amounts that were purchased by RTIN after RTIN took it over? Your Honor, the answer to that is, I guess I have a couple of responses. First of all, the Chamberlain Declaration, which was submitted as part of Amerisource's summary judgment papers, clearly set forth Amerisource's process for accounting for the payments. He clearly explained the payments came in and where they went. Your Honor, the district court accepted that, accepted Mr. Chamberlain's declaration. Mr. Meyer was unsuccessful in raising any kind of argument to persuade the district court that that was inaccurate. But second, the legal basis or the legal concept that would support that is the U.S. v. American Carmel Company case. That's 172F sub 95, and that's the case that says in accounting for payments when they come in, it's appropriate to first apply payment to that part of the debt that is least secured. Doesn't that case cite a Superior Court Pennsylvania case? I believe it does, yes, Your Honor. Are you familiar with, and I discovered a case in our research, the case in Raywoods Estate? I noticed neither you nor Mr. Moffitt cited it. Are you familiar with that case? I'm not, Your Honor. I'm not going to put you on the spot and ask you about it. I'm going to try it. It seems to hold a different role, and it is a Pennsylvania Supreme Court case. The problem I have with this position here is the district court refers to, I believe the district court in this case refers to the fact that the case that American Carmel was based on was a PA Supreme Court case when it was really a PA Superior Court case. Okay. And this Raywoods Estate was a Pennsylvania Supreme Court case thereafter, and it basically establishes a different rule where there is no clear intent on either side. It says that your payment would be applied to the first, basically the first bills. First in, first out. Well, in this case, Your Honor, Mr. Chamberlain's declaration did set forth that that was, that Amerisource definitely did have an intent as to how the money should be applied. And do you think that is enough to take this out of the Woods Estate, if you accept my summary of Woods Estate? Based on your explanation, I would argue yes, Your Honor, but I guess I have a couple other points. First, this issue is a $145,000 issue out of the whole realm of the case. Let me tell you something. I once had a lawyer say, this is only $65,000. And when I pointed it out to him, the percentage of what a Third Circuit judge needs to hear, he wished he hadn't said it. So, I'm warning you. I didn't mean it in that context, Your Honor. He really wished he hadn't said it. It was also in terms of, you know, a boxcourt company. It's a lot of money. The point that I would make, Your Honor, is the reason that this issue exists is because Amerisource took money that RTIN paid. This is $330,000 that RTIN paid after the December 5th closing and applied some of that to the APS debt. Okay? So, in any event, Mr. Myers should be grateful that Amerisource applied some of that money to the APS debt as opposed to applying some to the RTIN debt. I just had a question on this prejudgment interest, which is not what the appeal focused on. But the argument is maybe that the prejudgment interest should have been cut off when the time partial summary judgment was added, whereas the court, and of course that interest rate was higher than the judgment or the final judgment. Yes, Your Honor. The court ran the prejudgment interest all the way to the time of the final judgment, even though it created partial summary judgment. My initial reaction to that was, well, that's right, because you can't execute on a partial summary judgment unless you get an order of finality under Rule 54. And a lot of people think of that rule as being significant to allow his appeal early when it was otherwise allowed. And it is. But I wondered in this case, and again, I don't want to embarrass anybody, but the case is not cited, but one of my law clerks brought to my attention a case, S-K-R-E-T-V-E-D-T versus E-I-Duke-Martha-Morris-372-103-193, in which the court said that the judgment in the proposal section, it's 28 U.S.C., section 1961, quote, does not by its terms mandate the judgment from which interest is calculated must be a final judgment. And it would therefore follow from that that we would calculate pre-judgment interest as ending at the time of the partial summary judgment. Because at that point, if there had been no pre-judgment interest, post-judgment interest would start running. I'm just wondering about that. Well, first, that's not Meyer's argument. That's not what Meyer is advancing. But I guess on top of that, that sounds... Well, Meyer is saying that there was an effective judgment, right? Well, it's sort of an equitable argument. I don't even know that he's arguing that Amerisource could have started execution at the time. Obviously, we couldn't start execution at the time the partial summary judgment was granted. The only thing that I would point out, Your Honor, and the Peterson versus Crown financial case is on point on this. This court's ruling in Peterson, 661 F. 2nd. 287, held that in that case it was a restitution case and equitable principles applied. What that means is because it was an equitable case, the district court was free in that case to cut off pre-judgment interest and change the way interest would otherwise be applied. Your Honor, Eves versus County of Cape May, also directly on point, says that Section 1961 has to be applied literally. Post-judgment interest can't accrue in a contract case until the judgment is entered. Now, I don't know the facts of the DuPont case. I don't know if that was a tort case. I don't know if it was a contract case. But in a contract case, pre-judgment interest runs up until the time judgment is entered. And post-judgment interest only can accrue after the judgment is entered. Okay. Thank you, Your Honor. Mr. Moffitt? Thank you, Your Honor. Just two points. First, if this is a totally unambiguous argument and the case should be decided on the face of the document, I wonder why counsel felt for the appellee found it necessary to go outside the agreement and introduce for the court information concerning a transaction unrelated to the guarantee, the RTIN asset transaction, in order to make the point that Mr. Meyer had his actions in that transaction reflected his intent with respect to the guarantee. That's exactly the kind of evidence that both sides should have the opportunity to present in full, fully on the record and develop a full record on to what extent extrinsic evidence reflects on intent. Second, with respect to the question of what is the correct analysis in measuring whether or not a material risk increased for the guarantor, I would submit that the correct analysis is not, as my opponent offered, that you look at the possible risk of liability under a guarantee agreement, but you look first to the modification. You look at the modification that occurred and determine whether that modification materially increased the risk. The reality of the modification was that $123,000 of opening orders subject to up to 150 days credit repayment terms ballooned to over to in the area of $500,000, and that's a material increase in the amount of extended credit term debt that Mr. Meyer guaranteed. Thank you, Your Honor. Do you agree that it was a problem of savings and assurances? Yes, we agree with that, Your Honor. Thank you, Mr. Moffitt. We thank both counsel for excellent arguments and will take the matter under advisement. Let's take a five-minute recess and we'll return for the next two cases. Thank you. Thank you, Your Honor. Oh, here it is.  Sure.